1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   NANG SAM,                              No.  2:16-cv-0286 JAM DB P

12                  Petitioner,

13        v.                                FINDINGS AND RECOMMENDATIONS

14   NEIL McDOWELL,

15                  Respondent.

16

17        Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a

18   writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

19   entered against him on November 4, 2011 in the Yolo County Superior Court on thirty-six counts

20   of lewd acts and sexual penetration resulting from his sexual abuse of his sister over a six-year

21   period.  He seeks federal habeas relief on the following grounds: (1) juror misconduct, (2)

22   instructional error, and (3) sufficiency of the evidence.  Upon careful consideration of the record

23   and the applicable law, the undersigned will recommend denial of petitioner's application for

24   habeas corpus relief.

25                            **FACTUAL BACKGROUND**

26        In its unpublished memorandum and opinion affirming petitioner's judgment of

27   conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

28   following factual summary:

                                        1

The victim, who was born in May 1996, is the youngest of seven siblings, who as relevant here included defendant, Ny, Chun, and Danny. Defendant is the oldest, born in February 1984. Their mother was "never home," so defendant was entrusted with caring for the other children. Below is an abbreviated recitation of the facts, which will be recounted in greater detail in the discussions of sufficiency of evidence (part II) and instructional error (part III).

Defendant started sexually abusing the victim when she was about six or seven years old, after the entire family had moved to a home on Casselman Drive (the first Casselman home) on May 1, 2003. Her other brothers had gone out and she wanted to go with them, but defendant made her stay home with him. Defendant touched her "private areas." During other times, defendant would use the ruse of hide and seek to capture the victim and touch her private parts. The touchings progressed to penetration of the victim's vagina and anus with defendant's penis and fingers. These touchings and penetrations continued when the family moved four houses down to another house on Casselman Drive (the second Casselman house) on July 1, 2005.

The last time defendant touched the victim was when he came into the room she shared with her brother Chun. As defendant "was touching [her]," he noticed there was "blood so he went out [of] the room...." The victim had started menstruating when she was 12.

In November 2010, the victim reported the molests to Sophy Dong, who was the fiancé of the victim's brother Ny.

In early December 2010, Dong texted defendant, stating (without elaborating) that what he had done to the victim was very "sick and wrong." Defendant responded that he thought of killing himself every day, he never wanted "that" to happen, and what he did was "very sinful."

In mid-December 2010, Dong drove the victim to the police department to report the molests.

In January 2011, the victim was interviewed at the Multi Disciplinary Interview Center for a couple hours by a police officer. (We will refer to this person later as the interviewer.)

In February 2011, defendant voluntarily participated in a police interview where he admitted to Detective Eric Angle some of the sexual conduct with the victim.

At trial, defendant did not testify and his defense in closing argument was that the victim's story "d[id]n't wash" because somebody would have witnessed the molests and there was no evidence defendant "penetrated [the victim] in any fashion."

People v. Sam, No. CO69687, 2013 WL 5308865, at **1-2 (Cal. Ct. App. Sept. 23, 2013).

////

2

**PROCEDURAL HISTORY**

The jury convicted petitioner of 36 counts of lewd acts and sexual penetration.[1]  The court sentenced him to a determinate term of 10 years in prison plus an indeterminate term of 40 years to life.  See Sam, 2013 WL 5308865, at *1.  In his appeal, petitioner raised four claims: (1) juror misconduct; (2) sufficiency of the evidence; (3) instructional error affecting four counts; and (4) shackling.  Id.  The Court of Appeal found petitioner's claim of instructional error meritorious, found that the error was harmless with respect to two counts, and reversed petitioner's convictions for two other counts of sexual penetration, counts 23 and 24.  Id. at *7-9.  The court denied all other claims.  Id. at *9.

Petitioner sought review in the California Supreme Court.  (LD 15.[2])  On January 15, 2014, the California Supreme Court denied the petition for review.  (LD 16.)

Petitioner filed his federal habeas petition here on February 12, 2016.  (ECF No. 1.) Respondent filed an answer on May 19, 2016.  (ECF No. 12.)  Petitioner did not file a reply.

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

---

[1] Specifically, petitioner was convicted of 32 violations of Penal Code § 288(a) for lewd and lascivious conduct with a child under the age of 14 (counts 1-20 and 25-36); two violations of Penal Code § 288.7(a) for sexual intercourse or sodomy of a child 10 years of age or younger (counts 21 and 22); and two violations of Penal Code § 288.7(b) for oral copulation with or sexual penetration of a child 10 years of age or younger (counts 23 and 24).  (RT 518-526.)

[2] Respondent lodged the state court record here on May 25, 2016.  (See ECF No. 13.)  Each document is identified by its Lodged Document or "LD" number.  In addition, the Record of Transcript is "RT;" the Clerk's Transcript is "CT;" and the Supplemental Clerk's Transcript is "SCT."

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. at 1451. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06). "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003)

4

(quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (Internal citations and quotation marks omitted.)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

There are two ways a petitioner may satisfy subsection (d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient and the state court opinion may not be entitled to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

The second test, whether the state court's fact-finding process is insufficient, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d

5

943, 972 (9th Cir. 2004)).  The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable.  <u>Id.</u> at 1147.  Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility."  <u>Perez v. Rosario</u>, 459 F.3d 943, 951 (9th Cir. 2006) (citing <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo.  <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008); <u>see also</u> <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").  For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding.  <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 186 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  <u>Stanley</u>, 633 F.3d at 859; <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'"  <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting <u>Barker v. Fleming</u>, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  <u>Richter</u>, 562 U.S. at 99.  This presumption may be overcome by showing "there is reason to think some other explanation for the state court's decision is more likely."  <u>Id.</u> at 99-100 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

////

expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. <u>Johnson v. Williams</u>, 568 U.S. 289, 292 (2013).

A summary denial is presumed to be a denial on the merits of the petitioner's claims. <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). <u>Stanley</u>, 633 F.3d at 860; <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." <u>Himes</u>, 336 F.3d at 853 (citing <u>Delgado v. Lewis</u>, 223 F.3d 976, 981 (9th Cir. 2000)). This court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." <u>Richter</u>, 562 U.S. at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006); <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056 (9th Cir. 2003).

## PETITIONER'S CLAIMS

Petitioner attaches his petition for review to the California Supreme Court as setting out the claims in his federal petition. (ECF No. 1.) They are: (1) juror misconduct; (2) sufficiency of the evidence; and (3) instructional error. Respondent filed an answer addressing each claim. (ECF No. 12.) Petitioner did not file a reply.

### I.     Juror Misconduct

Petitioner argues a juror was biased based on her responses to the juror questionnaire and the trial court erred in refusing to dismiss her. Respondent contends the bias argument is

procedurally barred because it was not raised in the trial court. Respondent further argues that the trial court did not violate petitioner's due process rights when he determined the juror was not biased and could serve on the jury.

## A. Factual Background

The Court of Appeal set out the facts relevant to this claim:

> Each prospective juror filled out a questionnaire that asked about qualifications to sit on this case. Question 27 asked the following: "Everyone has some biases, prejudices or preconceived ideas. Do you believe you have any which would interfere with your ability to fairly decide this case?" Juror No. 8 checked "yes" and in the lines asking, "If yes, please explain," Juror No. 8 wrote, "I have known an individual who (as a minor) was abuse[d] by a sibling, a potential bias." Question 43 asked, "Have you, a family member, or a friend, ever been a witness to a sexual assault or sexual misconduct....?" [Juror No. 8] checked "yes." In the lines asking, "If yes, please explain," Juror No. 8 wrote, "would prefer not to explain." In the lines asking, "What action did you take, if any, as a result of what you witnessed or what you were told," Juror No. 8 wrote, "no action." On the day of jury selection, August 2, 2011, nobody questioned Juror No. 8 about her responses. Defense counsel did not object to her for cause, either, and she was seated as a juror.

> On August 2, 2011, Juror No. 8 submitted the following note to the court: "In my question[nai]re I had filled out that I had personal reasons for which I believe I would be biased in this case. These reasons are of a very personal nature and I had hoped I would not have to discuss them. As a youth I had been molested by a family member. This was not something I had ever discussed with anyone and would prefer not to discuss it further. I am not sure I would be biased in either side but this case would bring me much emotional trauma, considering my situation. I would please ask you to dismiss me f[rom] this trial. I have worked many years to cope with my situation, please understand."

> First thing on August 3, 2011, the court questioned Juror No. 8 with both sides present. The court asked, "Are the views you expressed in the letter you sent me yesterday still your views today?" Juror No. 8 responded, "Yes, I think I could be non-biased, but I do think that it would be more emotionally draining than—I understand that's not really a good reason, but that still stands." She continued, "Like I said, I mean, I really do think that I could be non-biased. I just wanted to let it be known to both of the attorneys and to yourself the situation and it will just be difficult emotionally."

> The juror then left the courtroom and the court told the attorneys the following: "It's my belief that [Juror No. 8] will do everything she can to abide by her oath, and for that reason, I do not find good cause at this point to excuse her...." Defense counsel then stated, "Just to recite my position in chambers was that she should be

8

replaced by an alternate given the letter which appears to state that she cannot be unbiased and she cannot be fair." The prosecutor responded, "That is not what the letter states." The court concluded, "She said she could be unbiased, but that it was going to be very emotional. The letter speaks for itself."

Sam, 2013 WL 5308865, at **2-3.

## B. Legal Standards

### 1. Sixth Amendment Right to a Jury Trial

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982); Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir.1986) ("Jurors have a duty to consider only the evidence which is presented to them in open court."). A defendant is denied the right to an impartial jury if even one juror is biased or prejudiced. Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir.), amended, 315 F.3d 1062 (9th Cir. 2002); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir.1998) (en banc).

Bias may be actual or presumed. The Ninth Circuit has examined three ways to prove bias. Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007). First, the court considered whether a juror's untruthfulness in response to a jury selection question demonstrated bias. The Court of Appeals found that Supreme Court authority required a showing that "'a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.'" Id. at 767 (quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984)); see also Elmore v. Sinclair, 2015 WL 5155402, *11 (9th Cir. Sept. 3, 2015) (same). Voir dire examinations protect the right to a fair trial by exposing biases that could result in a juror being excused for cause or by providing "hints of bias" that may assist a party in exercising a peremptory challenge. McDonough Power Equip., 464 U.S. at 554. Courts have found bias based on untruthful voir dire responses where a juror in a heroin-conspiracy trial failed to inform the court that he had two children in prison for heroin-related offenses in United States v. Eubanks, 591 F.2d 513, 517 (9th Cir. 1979), and where a juror

in a capital murder trial failed to disclose the fact her brother had been murdered and her husband was in jail on a rape charge in <u>Dyer v. Calderon</u>, 151 F.3d 970 (9th Cir. 1998).

When a tenable claim of juror bias has been made, a hearing should be held to permit the defendant to prove bias. <u>See</u> <u>Smith v. Phillips</u>, 455 U.S. 209, 215 (1982). For example, where a juror was untruthful on voir dire, the only way to establish bias will be to question the juror about his or her impartiality. <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 420, 442-44 (2000). The Court in <u>Smith</u> stressed the necessity of a hearing. In that case, defense attorneys learned after trial that, during the course of the trial, one of the jurors had applied for an investigator job in the district attorney's office. Upon the motion to set aside the verdict, the trial judge held an evidentiary hearing. After hearing testimony from the juror and the prosecuting attorneys, the trial judge concluded that while the juror's application was an "indiscretion," he found no indication it affected the juror's ability to be impartial. 455 U.S. at 213-14. The defense appealed, arguing that bias should be implied in this situation. While it did not reject the doctrine of implied bias, the Court focused instead on the necessity of a hearing: "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." <u>Id.</u> at 215. The question, then, is what sort of burden a defendant or petitioner must bear to be entitled to a hearing.

The second way to prove bias requires a showing of actual bias. Actual bias is shown by "'the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.'" <u>Fields</u>, 503 F.3d at 767 (citations omitted). "Actual bias is typically found when a prospective juror states that he cannot be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view." <u>Id.</u>; <u>see</u> <u>United States v. Gonzalez</u>, 214 F.3d 1109, 1112 (9th Cir. 2000) (collecting cases; actual bias shown where potential juror stated he could not be impartial, where juror in case involving a labor union emphasized his negative experience with unions and was equivocal when asked if he could be fair, and where juror in drug distribution case admitted to a conviction for drug possession but stated he had been entrapped).

Finally, a party could show presumptive or implied bias. The Court of Appeals has stated broadly that where a juror's actions or misconduct create "destructive uncertainties" about the

indifference of the juror, bias should be presumed.  Green v. White, 232 F.3d 671, 676 (9th Cir. 2000).  Typically, courts have implied bias from "an 'extreme' and 'extraordinary' relationship between a juror and an aspect of the litigation."  Fields, 503 F.3d at 775 n.14; e.g., Parker v. Gladden, 385 U.S. 363 (1966) (bailiffs who helped sequester jury were also prosecution witnesses); Smith, 455 U.S. at 222 ("extreme situations that would justify a finding of implied bias" include "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction") (O'Connor, J., concurring); United States v. Allsup, 566 F.2d 68, 71-72 (9th Cir. 1977) (two jurors in bank robbery trial biased because they worked for a different branch of the bank that was robbed).  Prejudice was also presumed in the following extraordinary circumstances: where television cameras were in the courtroom in a highly publicized trial, Estes v. Texas, 381 U.S. 532 (1965); and where the FBI spoke to jurors regarding another case which also involved Communist party affiliation, Gold v. United States, 352 U.S. 985 (1957).

Finally, as described above, the Court in Smith determined that, after the trial court conducted a hearing and determined the juror was not, in fact, biased, the Court would not go on to imply bias based on the juror's submission of an employment application to the prosecutor's office.  455 U.S. at 215. However, the state court cannot be faulted with failing to apply a presumptive or implied bias standard.  The Ninth Circuit just recently reiterated that "[t]here is no clearly established federal law regarding the issue of implied bias.  The Supreme Court has never explicitly adopted or rejected the doctrine of implied bias."  Hedlund v. Ryan, 854 F.3d 557, 575 (9th Cir. 2017) (citing Fields, 309 F.3d at 1104).

Not every incident of juror misconduct requires a new trial.  United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974).  Rather, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial."  Id.  On collateral review, juror misconduct claims "are generally subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious' effect or influence in determining the jury's verdict."  Jeffries v. Wood, 114 F.3d 1484, 1491 (9th Cir. 1997) (citing Brecht v. Abrahamson, 507 U.S. 619, 638

1  (1993)), overruled on other grounds by Gonzalez v. Arizona, 677 F.3d 383 (9th Cir. 2012); see

2  also Brown v. Ornoski, 503 F.3d 1006, 1018 (9th Cir. 2007); Fields , 503 F.3d at 781 & n. 19

3  (noting that Brecht provides the standard of review for harmless error in cases involving

4  unconstitutional juror misconduct); Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (a

5  habeas petitioner must show that the alleged error "'had substantial and injurious effect or

6  influence in determining the jury's verdict.'").

7  **2.  Procedural Default**

8  Under the procedural default doctrine, federal courts will not review a question of federal

9  law previously decided by a state court if the state court's decision rests on a state law ground that

10  is independent of federal law and adequate to support judgement.  Coleman v. Thompson, 501

11  U.S. 722, 729 (1991).  A state procedural rule is independent unless it appears "to rest primarily

12  on federal law or appears to be interwoven with federal law."  Id. at 734.  A state procedural rule

13  is adequate if it is "'firmly established and regularly followed' by the time as of which it is to be

14  applied."  Ford v. Georgia, 498 U.S. 411, 424 (1991).  The petitioner may only avoid default if he

15  can establish cause and prejudice, or that failure to consider the claim will result in a fundamental

16  miscarriage of justice.  Coleman, 501 U.S. at 750.

17  **C.  Decision of the State Court[3]**

18  The Court of Appeal construed petitioner's claim as having two bases for relief: (1) that

19  Juror No. 8 committed misconduct when she intentionally concealed that she had been a child

20  molest victim, and (2) that the trial court erred when it concluded Juror No. 8 was not biased and

21  refused to excuse her.  The court held petitioner's first contention was procedurally barred

22  because it was not raised at trial.  It further held the trial court did not abuse its discretion in

23  concluding that Juror No. 8 was not biased.

24  ////

25  [3] Because the California Supreme Court denied review, the opinion of the California Court of
26  Appeal is the last reasoned decision of the state court for purposes of determining the
   reasonableness of the state court denial of petitioner's claims.  Ylst v. Nunnemaker, 501 U.S. 797,
27  803 (1991) (Federal courts will presume "[w]here there has been one reasoned state judgment
   rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same
28  claim rest upon the same ground.")

12

Defendant's contention of error begins with an argument that Juror No. 8 committed misconduct in violation of his right to trial by an unbiased, impartial jury by "intentionally conceal[ing] the fact that she herself was a molest victim." Defendant has forfeited this argument by failing to raise it in the trial court. (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 556 [the failure to object in the trial court, even to errors of constitutional dimension, may lead to forfeiture of the claim on appeal].) In the trial court, defendant argued the court should discharge Juror No. 8 "given the letter which appears to state that she cannot be unbiased and she cannot be fair." Intentional concealment and bias are two separate issues for the trial court, each of which when raised the appellate court analyzes separately. (*See People v. McPeters* (1992) 2 Cal.4th 1148, 1175 [noting the two issues as separate and then analyzing whether a juror's nondisclosure was inadvertent and then analyzing under an abuse of discretion standard whether the juror was biased].) By failing to raise the issue of whether the nondisclosure was intentional, defendant deprived the trial court of the opportunity to assess the issue of whether the concealment was intentional, which was critical, because a trial judge "is in the best position to assess the state of mind of a juror or potential juror on voir dire examination." (*Ibid.*)

As to the issue defendant did raise in the trial court, i.e., that Juror No. 8 was biased because she could not be fair, the court was well within its discretion to conclude otherwise. (*People v. McPeters*, *supra*, 2 Cal.4th 1148, 1175 [standard of review].) On the juror questionnaire, she was advised to base her decision on only the evidence presented in court. When asked if she could do that, she answered "yes." The same questionnaire also advised her to follow the law as the judge explained it, whether or not she agreed with it. When asked if she could do that, she again answered "yes." After she was selected as a juror, but before presentation of the evidence, she submitted the letter to the court about her prior molestation. (*Id.* at p. 1175 [juror's candid disclosure before the trial began supported the trial court's determination that the juror could be fair and impartial].) Finally, when questioned by the court about her letter, she twice stated she thought she could be "non-biased." On this record, the court was within its discretion to conclude Juror No. 8 was not biased and therefore could remain on the jury.

Sam, 2013 WL 5308865, at *3.

### D. Analysis

The two questions for this court, as framed by federal law, are, first, whether Juror No. 8's response to Question 27 of the juror questionnaire was dishonest and whether, had she answered the question honestly, that "correct response would have provided a valid basis for a challenge for cause." McDonough, 464 U.S. at 556. Second, whether the trial court violated petitioner's rights to a fair trial when he refused to dismiss Juror No. 8 for bias.

13

### 1. Response to Juror Questionnaire

As set out above, the Court of Appeal found the first claim procedurally barred because it was not raised at trial. California's contemporaneous objection rule requires an objection at trial to preserve the right to appeal. See Xiong v. Felker, 681 F.3d 1067, 1075 (9th Cir. 2012). The Ninth Circuit has held that the contemporaneous objection rule is an independent and adequate state ground and has applied it as a procedural bar to deny federal habeas claims. See, e.g., id. The bar is only surmountable if the petitioner shows cause for the default and prejudice resulting therefrom. Coleman, 501 U.S. at 750.

Petitioner argues the state court erred in applying the procedural bar. He contends that his trial counsel's objection to Juror No. 8 necessarily included consideration of the juror's questionnaire responses, and, in fact, the trial court recognized that the responses were "not entirely clear." (See RT 40.) However, he continues, the trial court did not then apply a presumption of prejudice which would have required the prosecution to prove the juror was not biased. (See ECF No. 1 at 41.)

In a "small category of cases" the federal court will reject the state court's application of the procedural bar. Lee v. Kemna, 534 U.S. 362, 381 (2002). The Supreme Court in Lee recognized that where a petitioner has "substantially complied" with the state court rule, the procedural default doctrine may not bar the claim. Id. at 382.

In Lee, the Court considered the following factual situation. Petitioner Lee sought a continuance from the trial court when a subpoenaed key defense witness, who had previously been present, was suddenly missing. The trial court denied the continuance. On direct review, the state court of appeals disposed of the claim on procedural grounds because the petitioner had failed to make the continuance motion in writing, as required by state court rules. The Supreme Court found this application of the procedural bar too technical considering the circumstances of the trial. The trial court had the opportunity to consider all of the petitioner's arguments. The Court further noted that the prosecution had not raised that procedural issue at trial and the trial court had not relied on the absence of a written motion when it denied a continuance. Id. at 365-67.

In the present case, state law recognized two distinct avenues to challenge juror bias. First, by showing an intentional failure to disclose information and, second, by showing actual bias. See People v. McPeters, 2 Cal. 4th 1148, 1175 (1992). Therefore, when petitioner's counsel argued bias as a result of Juror No. 8's letter to the court, he did not necessarily put the trial judge on notice that he was also challenging the juror's responses to the questionnaire. Under these circumstances, this court cannot say application of the procedural bar was so unfair that this court should disregard it.

Once it is determined that a procedural bar applies to his claim, the next question is whether petitioner has made a showing of cause and prejudice or a fundamental miscarriage of justice to except him from the default. Petitioner does not argue either exception. Accordingly, petitioner's claim of juror bias based on Juror No. 8's responses to questions in the juror questionnaire is procedurally barred.

Even if the court considers the merits of this claim, it should fail. As stated above, the trial judge made clear he was aware that the questionnaire responses were not fully forthcoming. Despite that, he made a determination, at a hearing attended by petitioner and his counsel, that Juror No. 8 was not biased. Therefore, even had petitioner's trial attorney appropriately raised the objection, he fails to show the trial judge's determination would have been any different.

To the extent petitioner argues Juror No. 8 intentionally concealed her bias, the court considers that argument when determining whether Juror No. 8 should be presumed biased or was, in fact, biased. See Green v. White, 232 F.3d 671, 676 (9th Cir. 2000) (pattern of concealment leads to presumption of bias) (citing Dyer v. Calderon, 151 F.3d 970 (9th Cir. 1998) (en banc)). Here, Juror No. 8's response to Question 27 of the juror questionnaire was, at best, evasive. When asked about potential bias, she stated: "I have known an individual who (as a minor) was abuse[d] by a sibling, a potential bias." The distinction between knowing someone who was abused and being yourself abused is a significant one. However, while the evasive answer may lead to a presumption of bias, the fact that Juror No. 8 attempted to clear up that response, without prompting, during jury selection shows that she understood the information should be revealed.

This is not a case like that considered by the Ninth Circuit in <u>Dyer</u>. In that case, a murder prosecution, a juror plainly lied in responding "no" to questions about whether she or any relatives had been the victim of crime or had been accused of a crime. 151 F.3d at 972. In fact, the juror's brother had been shot and killed and her husband was in jail. <u>Id.</u> at 972-73. The court found the juror's lies "gave rise to an inference that she chose to conceal important facts in order to serve as a juror and pass judgment on Dyer's sentence." <u>Id.</u> at 982. That is not the case here.

Juror No. 8's evasive answer to Question 27 was simply an attempt to avoid having to discuss a painful part of her history. Further, she was not evasive when asked in Question 43 "Have you, a family member, or a friend, ever been a witness to a sexual assault or sexual misconduct....?" Juror No. 8 checked "yes." In the lines asking, "If yes, please explain," Juror No. 8 wrote, "would prefer not to explain." Juror No. 8's evasive answer was clearly not an attempt to get herself on the jury as the court found in <u>Dyer</u>. <u>See also</u> <u>Hedlund</u>, 854 F.3d at 575 n.12 (court considers that there was no indication the juror tried to conceal bias to influence the outcome of the trial). The court finds no actual or implied bias based on Juror No. 8's responses to the juror questionnaire.

## 2. Trial Court's Finding of No Bias

Petitioner next argues that the trial court violated his right to a fair trial when he refused to dismiss Juror No. 8 for bias. The facts demonstrate that the trial judge was well within his discretion to keep Juror No. 8 on the jury.

After she was selected as a juror, Juror No. 8 sent the trial judge a note stating that she had been molested by a family member as a child, was "not sure I would be biased in either side," but was concerned that the trial would cause her emotional trauma and asked to be dismissed as a juror. (<u>See</u> SCT (LD 6).) The next morning, the trial judge held an in camera conference, apparently with counsel for both parties, and then questioned Juror No. 8 in court, with defendant and counsel for both parties present. (RT 40.) The judge asked Juror No. 8 whether the view expressed in her note to the court were still her views. She replied that they were and added, "I think I could be non-biased, but I do think that it would be more emotionally draining than - - I understand that's not really a good reason, but that still stands." (RT 41.) When asked whether

she was willing to participate as a juror, she repeated that "I really do think that I could be non-biased." (Id.)  The trial judge then excused the juror and informed counsel that his "view has changed from the opinions I expressed ten minutes ago." (RT 41-42.)  The judge stated that he felt Juror No. 8 "will do everything she can to abide by her oath, and for that reason, I do not find good cause at this point to excuse her." (RT 42.)  The judge added that he would check in with Juror No. 8 at the end of the week to "find out how she's coping with the evidence in the case." (Id.)  In his petition for review, petitioner's counsel noted that the record does not show that the trial judge did check with Juror No. 8 that Friday.

The trial judge in this case took reasonable steps to ensure Juror No. 8 should remain on the jury.  The Supreme Court has held that a juror who was untruthful on voir dire should be questioned to determine whether he or she could be impartial at trial.  See Williams v. Taylor, 529 U.S. 420, 442-44 (2000).  The trial judge asked those questions of the juror and, based on his determination of her credibility in light of the same evidence that was before the state appellate courts and is now before this court, found that she could be impartial.  Petitioner has provided no new evidence that should have caused the state appellate courts, or should cause this court, to doubt the trial judge's finding, which is entitled to a great deal of deference since the trial judge alone among the courts reviewing this claim had the ability to adjudge the juror's credibility.  His determination that Juror No. 8 was not biased was neither contrary to nor an unreasonable application of clearly established federal law.  That determination is also supported by the record.  Accordingly, petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d).  His claims of juror misconduct should be denied.

**II.     Sufficiency of the Evidence**

Petitioner argues there was insufficient evidence to support jury findings that the charged offenses occurred during the approximately two-month windows identified in the charging document.

////

////

////

## A. Applicable Legal Principles

### 1. Standards for Sufficiency of the Evidence Claim

The United States Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 324 n.16).

The Supreme Court recognized that Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam). Moreover, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id. (citing Renico v. Lett, 559 U.S. 766 (2010)). The Supreme Court cautioned that "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Id.

////

////

////

////

1          **2.  State Law Standards**

2          Petitioner was charged with violations of California Penal Code §§ 288(a), 288.7(a), and

3   288.7(b).[4]  The elements of § 288(a) are that the defendant (1) touched a child under the age of

4   fourteen (2) with the specific intent to arouse either himself or the child.  People v. Imler, 9 Cal.

5   App. 4th 1178, 1181–1182 (1992).  A violation of § 288.7(a) requires that the defendant (1)

6   engage in sexual intercourse or sodomy (2) with a child who is ten years of age or younger.

7   People v. Mendoza, 240 Cal. App. 4th 72, 79 (2015).  And, § 288.7(b) covers (1) oral copulation

8   or sexual penetration (2) with a child ten years of age or younger.

9          Recognizing the difficulties with children's testimony about molestations where the

10  perpetrator had continual access to the child victim, in People v. Jones, 51 Cal. 3d 294, 316

11  (1990), the California Supreme Court held that to establish an act of sexual molestation in this

12  situation the victim must describe (1) the kind of act or acts committed with enough specificity to

13  ensure that unlawful conduct has occurred and to differentiate between the various types of

14  proscribed conduct; (2) the number of acts committed with sufficient certainty to support each

15  count in issue; and (3) the general time period in which the acts occurred to ensure that they were

16  committed within the applicable limitations period.

17          **B.  Decision of the State Court**

18                    *Sufficient Evidence Supported The Verdicts*

19          Defendant contends there was insufficient evidence of counts 2 and
            3, 5 through 12, and 14 through 36 because the People failed to
20          "prove[ ] the time-specific crimes with which it chose to charge
            [him]." He claims that the evidence failed to establish that an
21          offense occurred during any of the time frames alleged in the
            information.
22
            We begin with a brief overview of how the case was charged and a
23          few basic propositions and then turn to the specific evidence
            offered to support the at-issue counts. The People's theory of the
24          case as stated in closing argument was "[s]ix counts a year for six
            years is what the defendant is charged with." Consistent with this
25          argument, the information alleged 36 counts, starting on May 1,
            2003, each with a two-month time period (i.e., count 1 occurred
26          "[o]n or about and between May 1, 2003 and July 6, 2003," count 2

27

28  _____
    [4] The correlation of each count with its Penal Code section is set out in note 1, supra.

occurred "[o]n or about and between July 7, 2003 and September 6, 2003," etc.).

"[G]eneric testimony" regarding child molestation "is sufficiently substantial from an evidentiary standpoint." (*People v. Jones* (1990) 51 Cal.3d 294, 313–314.) The victim must be able to describe (1) the kind of act or acts committed with sufficient specificity to assure unlawful conduct has occurred and to differentiate between types of conduct, (2) the number of acts with sufficient certainty to support the number of counts, and (3) the general time period to assure the acts were committed within the applicable statute of limitations. (*Id.* at p. 316.) "Where alibi is not a defense, the prosecution need only prove the act was committed before the filing of the information and within the period of the statute of limitations. [Citation.] This is so because the precise time of a crime need not be declared in the accusatory pleading except where time is a material ingredient of the offense. [Citation.] Time is essential if the defense is alibi." (*People v. Obremski* (1989) 207 Cal.App.3d 1346, 1354.) In *Obremski*, the defendant was charged with 26 sex crimes and the jury found him guilty of 25. (*Id.* at p. 1348.) The crimes were committed against his stepdaughter starting when she was 12 for five years when they were living together. (*Id.* at pp. 1348–1349.) During this period, they "had sexual intercourse at least once a week and as often as three times a day." (*Id.* at p. 1349.) "Appellant's defense was (1) he was physically incapable of having sex and (2) [the victim's] testimony was not credible." (*Id.* at p. 1350.) The appellate court affirmed the convictions, reasoning: "Since the exact times of the offenses are not material in the case before us, in that appellant did not attempt to prove an alibi and had uninterrupted access to the victim, the imprecise charges did not mislead him and violate his right to due process." (*Id.* at p. 1354.)

With these points in mind, we turn to the counts that defendant has alleged lack sufficient evidence.

A

*Counts 2 And 3*

Count 2 and count 3 were lewd acts on a child under 14, alleged to have occurred "[o]n or about and between" July 7, 2003 and September 6, 2003 and September 7, 2003, and November 6, 2003, respectively. The following was evidence of count 2: The first vaginal touching was at the first Casselman house. Defendant touched the skin of her legs, "boobs," and "private parts." The family moved to the first Casselman house on May 1, 2003 and lived there until July 1, 2005, at which time they moved four houses down to another house on that drive. The following evidence supported count 3: The victim told the interviewer that defendant "raped" her a "couple of weeks later," and defined rape as "t[a]k[ing] my virginity away." Similarly, defendant told Detective Angle the first vaginal intercourse happened at the first Casselman house, which he thought occurred a month after the first sexual contact.

*Counts 5 Through 12*

Count 5 alleged a lewd act "[o]n or about and between January 7, 2004 and March 6, 2004." Defendant admitted to Detective Angle he started molesting the victim when she was six or seven years old and he "did it for a little bit." He would "take [his] penis out ... [and] just rub it a little bit" "around her ... vagina." During the time period alleged in count 5, the victim was seven years old.

Count 6 alleged a lewd act "[o]n or about and between March 7, 2004 and April 30, 2004." The victim was still seven years old. Defendant admitted to Detective Angle that he rubbed his penis around the victim's vagina more than once, i.e., he would get "possessed again ... and then it would happen again—same thing."

Count 7 alleged a lewd act "[o]n or about and between May 1, 2004 and July 7, 2004." Defendant admitted to Detective Angle that he stuck his finger in the victim's anus once and then stopped, when the victim was eight years old. By May 1, 2004, the victim had turned eight.

Count 8 alleged a lewd act "[o]n or about and between July 8, 2004 and September 7, 2004." The victim told the interviewer defendant made her "grab his dick and then go up and down on it" and that it happened at the first Casselman house (in addition to happening at the second one). They lived at the first house from May 1, 2003 through July 1, 2005.

Count 9 alleged a lewd act "[o]n or about and between September 8, 2004 and November 7, 2004." The victim told the interviewer defendant "put his fingers in [her] vagina and then rape[d] [her] there." Defendant admitted to Detective Angle he did that to her once when she was eight years old. During the time period alleged in this count, the victim was eight years old.

Count 10 alleged a lewd act "[o]n or about and between November 8, 2004 and January 7, 2005." This count is supported by evidence defendant touched the victim's private parts outside her clothing while playing hide and seek "once in awhile" at the first Casselman house. Similarly, one of the victim's other brothers (Chun) testified they all played hide and seek "[a]bout five times ... over six or seven months." The family lived at the first Casselman house until July 1, 2005.

Count 11 alleged a lewd act "[o]n or about and between January 8, 2005 and March 7, 2005." The victim told the interviewer when she was eight years old, defendant woke her up, told her to go into the bathroom, and then "[t]old [her] to put [her] hands on the toilet and ... [h]e pulled [her] pants down and then he stuck his wiener into [her] butthole." The victim was eight years old at the time frame alleged. She thought this was the first time defendant sodomized her.

Count 12 alleged a lewd act "[o]n or about and between March 8, 2005 and April 30, 2005." The victim told the interviewer he would sodomize her "[l]ike every other day or twice a week" or "just like whenever he felt like doing it." Based on this evidence, the jury could have found defendant sodomized her the few weeks following the first incident.

## C

### Counts 14 Through 36

Count 14 and beyond alleged conduct during the time the family lived at the second Casselman house, as those counts occurred "[o]n or about and between" July 9, 2005 and beyond, and the family moved to the second house on July 1, 2005.

Count 14 alleged a lewd act "[o]n or about and between July 9, 2005, and September 8, 2005." The victim told the interviewer defendant "raped [her] in [her] butt" when she and Chun slept in the living room.[note 1] She explained he would do that "every other night" because it was "a[n] easy way for him to come 'cause ... we didn't have any doors there so he can just come and then he would rape me right there and then—and then he'll go back inside his room."

The victim's statement that defendant raped her "every other night" also supported defendant's convictions for lewd acts or sexual penetration alleged in counts 15 through 22 and counts 25 and 28, since those counts all occurred on or before January 2008 when Ny moved out and Chun and the victim got the bedroom and a bunk bed.[note 2]

Counts 23 and 24 alleged defendant engaged in two acts of sexual penetration with a child 10 years old or younger "[o]n or about and between" January 10, 2007 to March 9, 2007 and March 10, 2007 to April 30, 2007. The victim was 10 years old during these time frames. The victim told the interviewer that while at the second Casselman house, defendant would touch her "always with his hands. Like he would actually like mess—like put his fingers in my vagina and then rape me there. And then he would sometimes rape me in the butt. It was always switching off. And then sometimes he would want to like rape me from my vagina. It was just like always on and off, like different times." When the interviewer asked her how many times defendant had put his fingers in her vagina, she said, "I don't know, a couple times."[note 3]

Counts 29 through 31 and counts 33 through 35 alleged more lewd acts. Count 29 alleged a lewd act "[o]n or about and between January 11, 2008 and March 10, 2008." Count 30 alleged a lewd act "[o]n or about and between March 11, 2008 and April 30, 2008." Count 31 alleged a lewd act "[o]n or about and between May 1, 2008 and July 11, 2008." Count 33 alleged a lewd act "[o]n or about and between September 12, 2008 and November 11, 2008." Count 34 alleged a lewd act "[o]n or about and between November 12, 2008 and January 11, 2009." And count 35 alleged a lewd act

"[o]n or about and between" January 12, 2009 and March 11, 2009. The victim told the interviewer that when she and Chun shared a room, defendant "would always come in the room every night—not every night but every time he wanted to touch me" and then "he would try to touch me and then he would rape me and ... I was just scared." Chun testified defendant came into his and the victim's room around midnight "once every few months." As noted, the victim and Chun shared a bedroom at the second Casselman home after Ny moved out, which was January 2008.

Count 32 alleged defendant committed a lewd act "[o]n or about and between July 12, 2008 and September 11, 2008." The victim told the interviewer that when they were at the second Casselman house, defendant "pulled [her] underwear down and pulled his pants and [then] started raping [her]" with "his wiener" in "[h]er ... butthole." It was during the summer when she was going into sixth grade, which would have made it the summer of 2005 when she was 11. However, the jury could have found, based on other evidence, the crime took place in the summer of 2008, because the victim also told the interviewer the incident took place at a time when Chun had a room, which would have been after January 2008, when she and Chun took over Danny and Ny's room.

Count 36 alleged defendant committed a lewd act "[o]n or about and between March 12, 2009 and April 30, 2009." The victim told the interviewer defendant came into the room she shared with Chun, "was touching [her]," "noticed there was blood so he went out the room and ... that's the last time." The victim started menstruating when she was 12. Since the victim was born in May 1996, she was 12 during the alleged time frame.

On this record, sufficient evidence supported the verdicts.

> [note 1] The victim told the interviewer she and Chun slept in the living room of the second Casselman house until their brothers Ny and Danny moved out. When they slept in the living room, the victim slept on a twin bed and Chun slept on a couch. Once Ny and Danny moved out, the victim and Chun moved into their bedroom and their mother bought a bunk bed for the victim and Chun. According to Dong, Ny moved out of the second Casselman home and into an apartment in Natomas with her in January 2008.

> [note 2] Count 15 alleged a lewd act "[o]n or about and between September 9, 2005 and November 8, 2005." Count 16 alleged a lewd act "[o]n or about and between November 9, 2005 and January 8, 2006." Count 17 alleged a lewd act "[o]n or about and between January 9, 2006 and March 8, 2006." Count 18 alleged a lewd act "[o]n or about and between March 9, 2006 and April 30, 2006." Count 19 alleged a lewd act "[o]n or about and between May 1, 2006 and July 9, 2006." Count 20 alleged a lewd act "[o]n or about and between July 10, 2006 and September 19, 2006." Count 21 alleged a sexual penetration "[o]n or about and between September 20, 2006 and November 9, 2006."

23

Count 22 alleged a sexual penetration "[o]n or about and between November 10, 2006 and January 9, 2007." Count 25 alleged a lewd act "[o]n or about and between May 1, 2007 and July 10, 2007." Count 26 alleged a lewd act "[o]n or about and between July 11, 2007 and September 10, 2007." Count 27 alleged a lewd act "[o]n or about and between September 11, 2007 and November 10, 2007." And Count 28 alleged a lewd act "[o]n or about and between November 11, 2007 and January 10, 2008."

[note 3]  In part III of the Discussion, we will explain that although the evidence was sufficient to support counts 23 and 24, there was instructional error associated with these counts that was not harmless beyond a reasonable doubt, requiring reversal of these counts.

*Sam*, 2013 WL 5308865, at *3-7.

## C. Analysis

### 1. Petitioner's General Challenges to Sufficiency of the Evidence

Petitioner argues there was insufficient evidence to support jury findings that the offenses charged in counts 2-3, 5-12, and 14-36 occurred during the approximately two-month windows identified in the charging document.  When conducting an analysis of sufficiency of the evidence, the court considers whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson, 443 U.S. at 319.

As set forth above, the essential elements of each crime are itemized in the statute.  Each required proof of an act – either touching with intent to arouse, sexual intercourse or sodomy, or oral copulation or sexual penetration.  In addition, each required proof that the victim was under age fourteen for the touching charges and was age ten or younger for the more serious charges.  The timing of each act was not an element of the crimes.  See People v. Neese, 272 Cal. App. 2d 235, 245 (1969) (Under California law, the "proof need not conform to the exact date laid in the information" where "the act ... charged is not the kind that does not constitute a crime unless committed on a specific date; time is not of the essence or a material ingredient of the offense; the record shows that defendant was in no manner misled or prevented from making a defense and defendant was in no danger of being placed twice in jeopardy."); see also Guam v. Campbell, No. CRA05-006, 2006 WL 3020779, at *4 (Guam Sup. Ct. Oct. 24, 2006) ("'[t]ime is a material element of an offense only if made so by statute'"(quoting United States v. Laykin, 886 F.2d

24

1  1534, 1543 (9th Cir. 1989))).

2      Other courts in this circuit considering arguments similar to petitioner's have also found

3  that the time period alleged in the information was not an essential element of these crimes and,

4  therefore, did not require proof to satisfy the Jackson standard.  See Lara v. Madden, No. EDCV

5  17-474-ODW(KS), 2017 WL 7938464, at *9 (C.D. Cal. Dec. 22, 2017) (two-year difference

6  between dates of the acts proven and dates alleged in the information not significant under

7  Jackson because timing of the acts was not an essential element of the crimes), rep. and reco.

8  adopted, 2018 WL 1135636 (C.D. Cal. Feb. 26, 2018); Zabala-Gonzales v. Long, No. ED CV 14-

9  232-DOC(PLA), 2015 WL 3617794, at *13 (C.D. Cal. Apr. 20, 2015), rep. and reco. adopted,

10  2015 WL 3618084 (C.D. Cal. June 8, 2015).

11      Petitioner argues that timing was an essential element in this case because there was

12  evidence from both defendant and the victim that the molestations were not perpetrated at a

13  constant pace.  However, petitioner does not explain why this is so.  Courts have held, and the

14  state Court of Appeal recognized in this case, that timing would only be an essential element of

15  the crimes if petitioner sought to prove an alibi.  See Sam, 2013 WL 5308865, at *4 (Where the

16  "appellant did not attempt to prove an alibi and had uninterrupted access to the victim, the

17  imprecise charges did not mislead him and violate his right to due process." (quoting People v.

18  Obremski, 207 Cal. App. 3d 1346, 1354 (1989))); see also Burbine v. Scribner, No. CIV S-04-

19  1691 LKK EFB P, 2009 WL 2136303, at *24 (E.D. Cal. July 15, 2009) (exact time of offenses

20  was not material and therefore not an element of the offenses; because petitioner did not attempt

21  to prove an alibi, the imprecise charges did not mislead him or violate his right to due process).

22  Petitioner does not argue that he made any attempt to put on an alibi defense at trial.  Because

23  state law defines the elements of the crime, Boyer v. Belleque, 659 F.3d 957, 965 (9th Cir. 2011),

24  and time is not one of them, any difference between the time period set out in the charging

25  documents and the time period proved does not require the court to find the convictions were not

26  based on substantial evidence.

27      The state Court of Appeal relied on the California Supreme Court's decision in Jones for

28  the proposition that generic testimony, untethered to a specific date, is adequate to support a

conviction for a sex crime perpetrated by a defendant with continual access to the victim. Petitioner presents no United States Supreme Court authority for the proposition that the standards set out in <u>Jones</u> for the consideration of a child's nonspecific, or "generic," testimony of abuse are insufficient to support a molestation conviction. The Ninth Circuit has found in a closely related context that the <u>Jones</u> framework is neither contrary to nor an unreasonable application of United States Supreme Court precedent. <u>See</u> <u>Brodit v. Cambra</u>, 350 F.3d 985, 988–89 (9th Cir. 2003) (rejecting claim that petitioner was denied notice of charges, in violation of due process, by information alleging sexual abuse on unspecified dates as approved in <u>Jones</u>). <u>Brodit</u> holds that § 2254(d)(1) precludes a claim that due process is violated by the absence in the charging document of precise dates. <u>Id.</u> It follows that § 2254(d)(1) also precludes a claim that due process is violated by conviction in the absence of evidence to establish, or jury unanimity regarding, precise dates.

Many courts in this circuit have similarly upheld the state court's reliance on generic testimony. <u>See, e.g.</u>, <u>Vidal v. Paramo</u>, No. SACV 13-1960 JVS (JC), 2015 WL 4040617, at *8 (C.D. Cal. June 9, 2015), <u>rep. and reco. adopted</u>, 2015 WL 4041532 (C.D. Cal. July 1, 2015); <u>Gucciardo v. Knipp</u>, No. 2:13-cv-0323 AC, 2015 WL 403852, at *11-12 (E.D. Cal. Jan. 28, 2015); <u>Nuno v. Davey</u>, No. 11-02446 SBA(PR), 2014 WL 3725332, at *12 (N.D. Cal. July 21, 2014); <u>Morales v. Ocegueda</u>, No. EDCV 11-802-PA (JEM), 2013 WL 6050476, at *9 (C.D. Cal. Nov. 13, 2013); <u>Trujillo v. Diaz</u>, No. 1:13-cv-0848-AWI-SAB-HC, 2013 WL 5672868, at *8 (E.D. Cal. Oct. 17, 2013); <u>Heller v. Mendoza–Powers</u>, No. C 05-3903 WHA (PR), 2008 WL 4279545 (N.D. Cal. Sept. 12, 2008). Because the evidence supports the verdicts under California law as interpreted by the California Supreme Court, <u>Jackson</u> is satisfied. <u>See</u> <u>Chein v. Shumsky</u>, 373 F.3d 978, 983 (9th Cir. 2004).

Petitioner also argues that the variance between the acts charged and the proof at trial violated his due process rights because he was not adequately notified of the charges. Petitioner cites two cases for the proposition that a conviction should be overturned where the evidence was insufficient to prove the commission of the crimes on or reasonably close to the dates set out in the charging document. Neither of those cases supports petitioner's argument.

1    Petitioner first cites United States v. Tsinhnahijinnie, 112 F.3d 988 (9th Cir. 1997), in

2    which the Ninth Circuit Court of Appeals overturned a conviction based on a significant variance

3    between the charged conduct and the proof at trial.  In Tsinhnahijinnie, the defendant was charged

4    with sexually assaulting the juvenile victim during a two-month period in 1992.  However, the

5    victim's testimony established sexual assault occurring two years later, in 1994.  The defendant

6    had been prosecuted for sexual abuse occurring in 1994 in a separate proceeding.  Further, the

7    evidence showed that in 1992 when the conduct was alleged to have occurred, the defendant and

8    victim did not reside on the Indian reservation, which was the basis for federal court jurisdiction.

9    Because the victim testified that she was abused while they lived on the reservation, no

10   reasonable juror could have concluded that the defendant's conduct occurred during the time

11   charged.

12       In the present case, the evidence did not prove conduct during a different time period.

13   Rather, as described by the state court, much of the evidence was identified with certain broad

14   time periods, during which the two-month time periods charged fell.  The holding of

15   Tsinhnahijinnie is not controlling.

16       In the second case cited by petitioner, the evidence similarly excluded any time around the

17   time period charged as the date of the crimes.  In United States v. Charley, 189 F.3d 1251 (10th

18   Cir. 1999), the court found a variance fatal because the evidence was completely untethered to

19   any time period.  The victim simply testified that the defendant had been abusing her "since she

20   was small," more than five times, and "not all of these times were in 1997."  With respect to the

21   charge that the defendant had abused the victim "on or about October 1995," court found no

22   evidence of any contact in the entire year of 1995.  The court noted that while a variance between

23   indictment and proof is not generally fatal, there was simply no evidence here of any abuse in

24   1995.  189 F.3d at 1273.  On that basis, the court reversed the conviction.  Again, the present case

25   is distinguishable.  Here, as laid out by the state Court of Appeal, there was evidence of abuse

26   covering the years in question.

27   ////

28   ////

27

The federal Courts of Appeals in both cases relied on the following rule: "[t]he government ordinarily need prove only that the crime occurred on a date reasonably near the one alleged in the indictment, not on the exact date." Tsinhnahijinnie, 112 F.3d at 991. Courts have noted that the time difference must be quite long to amount to a lack of notice. Cf., United States v. N.A. Juvenile, 7 F. App'x 663, 665 (9th Cir. 2001). Some courts have upheld a time difference of up to six months. See United States v. Covington, 411 F.2d 1087, 1088 (4th Cir. 1969) (six-month variance was not fatal); United States v. Harrell, 737 F.2d 971, 981 (11th Cir. 1984) (conviction was upheld where there was a variance of four to five months-specifically, alleged date in indictment was February, but evidence showed that the crime was committed in the summer); United States v. Odom, 736 F.2d 104, 118 (4th Cir. 1984) (upholding conviction despite variance of one to two months). Other courts have held that "'proof of any date before the return of the indictment and within the statute of limitations is sufficient.'" Campbell, 2006 WL 3020779, at *7 (quoting United States v. Bowman, 783 F.2d 1192, 1197 (5th Cir. 1986)).

To succeed on this due process claim, not only must a defendant show a substantial difference between the date charged and the date proved, he must also show he was prejudiced by the variance. "As long as a defendant is neither surprised nor hampered in preparing his defense, there can be a variance between the dates proved at trial and those alleged in an indictment or information." Campbell, 2006 WL 3020779, at *5 (quoting Tingley v. State, 549 So. 2d 649, 650 (Fla. 1989)). "Variance in the proof is grounds for reversal only when it affects the defendant's 'substantial rights.'" United States v. Flaherty, 668 F.2d 566, 582 (1st Cir. 1981) (quoting Berger v. United States, 295 U.S. 78, 82 (1935)); see also Tsinhnahijinnie, 112 F.3d at 991 ("A variance which does not affect the substantial rights of the defendant is harmless error."); United States v. Cina, 699 F.2d 853, 858-59 (7th Cir. 1983) (where the defendant did not argue that the difference between the allegation and proof prejudiced his ability to provide a defense, the variance was harmless). Petitioner fails to demonstrate, or even argue, that he suffered prejudice as a result of any variance between the time periods in the charges and the time periods proved.

////

////

Finally, petitioner argues that the state court "randomly" assigned conduct to certain time periods. (ECF No. 1 at 51.) Petitioner asserts that there is no way to know whether those are the time periods the jury found. When reviewing the record for sufficiency of the evidence, this court does not attempt to divine the jury's reasoning. Rather, the question for this court is whether "any rational trier of fact" could find the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 319 (emphasis in original). Because, as discussed above, time is not an essential element of the charged crimes, the appellate court was free to identify evidence showing specific conduct occurring during a time period encompassing that charged. This argument also fails.

### 2. Petitioner's Specific Challenges to Sufficiency of the Evidence

Petitioner also challenges two of the state court's specific factual determinations. This court considers those factual determinations under the standard set out in 28 U.S.C. § 2254(d). The question is whether petitioner has shown the state court's findings of fact "were not supported by substantial evidence in the state court record." See Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012).

First, petitioner argues that the evidence does not support the state court's finding that, based on the victim's statement, the victim and her brother Chun "slept in the living room of the second Casselman house until their brothers Ny and Danny moved out." The state court relied on that finding to support counts 14-22, 25 and 28, which alleged conduct occurring between July 9, 2005 and January 2008, when Ny moved out and the victim and Chun moved into that room. Sam, 2013 WL 5308865, at *5 n.1. The state court recounted that the victim told the interviewer defendant "raped [her] in [her] butt" when she and Chun slept in the living room. She explained he would do that "every other night." Sam, 2013 WL 5308865, at *5-6.

Petitioner argues the evidence does not support a finding that the victim and Chun slept in the living room during that entire time period. (ECF No. 1 at 53.) In her statement to the police investigator, the victim stated that when the family moved to the second house on Casselman, she and Chun slept in the living room. (SCT 29 (LD 4).) When Ny and Danny moved out, the victim and Chun moved into that room and got a bunk bed. (Id. at 24-25.)

29

1    Ny moved out in January 2008.  (RT 73-75.[5])

2          Petitioner contends that testimony of Dong and Chun showed that the victim and Chun did

3    not sleep in the living room the entire time.  Petitioner is apparently relying on the testimony of

4    Dong and Chun that Chun and the victim shared a "room."  (See RT 77 (Dong's testimony); RT

5    382 (Chun's testimony).  However, neither Dong nor Chun identified whether that "room" was a

6    bedroom or the living room.  Petitioner also points to Chun's and Johnny's testimony that Johnny

7    sometimes shared a room with the victim and Chun.  (See RT 382 (Chun's testimony); RT 389

8    (Johnny's testimony).)  But, this testimony is also not specific.  It is not clear whether Chun and

9    Johnny were testifying about sharing a room in the first Casselman house or the second one.

10   Counts 14-22, 25 and 28 are all identified with the time period when the family resided at 871

11   Casselman, the second Casselman house.  Viewing the evidence in the light most favorable to the

12   prosecution, it was sufficient to support a finding that the victim and Chun slept in the living

13   room from the time they moved into 871 Casselman until January 2008 when Ny moved out.

14         Further, even if the evidence showed that there was some period of time the victim did not

15   sleep in the living room, her statements to the police, and petitioner's confessions, were sufficient

16   to support the nine convictions for lewd conduct and two convictions for sexual penetration

17   alleged in counts 14-22, 25 and 28 during that general time period.  As discussed above, the

18   timing of each count was not an essential element of the crime.

19         Second, petitioner challenges the state court's evidentiary support for count 36, the last

20   incidence of molest.  The state court held:

21                 Count 36 alleged defendant committed a lewd act "[o]n or about
                   and between March 12, 2009 and April 30, 2009."  The victim told
22                 the interviewer defendant came into the room she shared with
                   Chun, "was touching [her]," "noticed there was blood so he went
23                 out the room and ... that's the last time."  The victim started
                   menstruating when she was 12.  Since the victim was born in May
24                 1996, she was 12 during the alleged time frame.

25   Sam, 2013 WL 5308865, at *7.  Petitioner argues that the victim gave varying accounts of when

26   she started menstruating.  He also points out that Dong testified that the victim started

27   _____

28   [5] Ny moved out with his girlfriend, Sophy Dong, in January 2008 according to her testimony.  It
     is not clear when Danny moved out, but it appears to have been on or prior to that date.

                                                30

menstruating before she started 6th grade, which would have been in 2007. Again, even if the dates this conduct occurred were not clearly established, there was sufficient evidence that this last incident of lewd conduct in fact occurred to support petitioner's conviction on count 36.

## III. Instructional Error

Petitioner's final claim alleges prejudice from instructional error. The Court of Appeal determined that the trial court committed instructional error as to four counts of sexual penetration, but that, with respect to two of those counts, the error was harmless. The court reversed petitioner's conviction on the other two counts.

### A. Underlying Facts and State Court Decision

> *The Court Erred In Its Instructions Regarding Counts 21 Through 24, And The Error Was Prejudicial As To Counts 23 And 24*
>
> Defendant contends his convictions for counts 21 through 24 for sexual penetration must be reversed because the trial court did not instruct the jury that it was required to find that the offenses took place on or after the effective date of Penal Code section 288.7, which was September 20, 2006. (Stats. 2006, ch. 337, § 9 [Sen. Bill 1128].) Penal Code section 288.7, subdivision (b) increased the punishment for sexual penetration from three, six, or eight years to 15 years to life in prison. (*Cf.* Pen.Code, § 288.7, subd. (b) ["Any person 18 years of age or older who engages in ... sexual penetration ... with a child who is 10 years of age or younger ... shall be punished by imprisonment in the state prison for a term of 15 years to life"] *with* Pen.Code, § 289, subd. (j) ["Any person who participates in an act of sexual penetration with another person who is under 14 years of age and who is more than 10 years younger than he or she shall be punished by imprisonment in the state prison for three, six, or eight years]".) We agree there was instructional error and find that the error was prejudicial as to counts 23 and 24.
>
> A
>
> *The Court's Error*
>
> Count 21 alleged a sexual penetration "[o]n or about and between September 20, 2006 and November 9, 2006."
>
> Count 22 alleged a sexual penetration "[o]n or about and between November 10, 2006, and January 9, 2007."
>
> Counts 23 alleged a sexual penetration "[o]n or about and between January 10, 2007 to March 9, 2007."
>
> Count 24 alleged a sexual penetration "[o]n or about and between March 10, 2007 and April 30, 2007."

31

The court instructed the jury pursuant to CALCRIM No. 207 as follows: "It is alleged that the crimes occurred on various dates. The People are not required to prove that the crime took place exactly on that day, but only that it happened reasonably close to that day."

During deliberations, the jury asked the following question: "No dates are specifically mentioned in the instructions to the jury, only on the charges. The text of 288.7(a) and 288.7(b) charge that the defendant had intercourse with or penetrated a person under the age of 10. However, no dates are mentioned in the text of the penal code. [¶] Are we supposed to convict the defendant for breaking the penal code, or only for breaking the penal code reasonably close to the dates the charges cover?"

The court responded as follows:

"The defendant is charged in each count with committing the alleged crime '[o]n or about and between' a specified date and time. I have provided you with a chart that lists the particular time period associated with each count.

"The People have presented evidence of more than one act to prove that the defendant committed the crimes during the period alleged. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of the acts during the period alleged and you all agree on which act he committed."

The court then recited the offense dates alleged as to counts 21 through 24. The court then stated, "In order to convict the defendant of any of these crimes, the prosecution must prove that the defendant committed the charged crime on or about and between the dates specified for that particular count."

As the People concede, the court's instruction was error because ex post facto principles prohibit a conviction for these crimes unless they occurred on or after the effective date of the statute, which was September 20, 2006. (*See Collins v. Youngblood* (1990) 497 U.S. 37, 42 [111 L.Ed.2d 30, 39] [" 'It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute ... which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto ' "].)

B

The Court's Error Was Harmless Beyond A Reasonable Doubt As To Counts 21 And 22, But It Was Prejudicial As To Counts 23 And 24

An ex post facto violation is reviewed to determine whether the violation is harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711].

32

(*People v. Hiscox* (2006) 136 Cal.App.4th 253, 261.)

1

*Counts 21 And Counts 22*

Count 21 alleged a sexual penetration "[o]n or about and between September 20, 2006 and November 9, 2006," and count 22 alleged a sexual penetration "[o]n or about and between November 10, 2006, and January 9, 2007.[6]"

The victim told the interviewer that defendant "raped [her] in [her] butt" when she and Chun slept in the living room in the second Casselman house, which was from July 1, 2005 (when the family first moved to the second Casselman house) to January 2008 (when Ny moved out and Chun and the victim got his bedroom). Based on the jury's verdict finding defendant guilty on all counts, it is clear the jury believed the victim's testimony and not defendant's. Based on her testimony that defendant "raped [her] in [her] butt" "every other night" (that would have encompassed the charged dates), we find the error in failing to instruct the jury it had to find the conduct occurred on or after September 20, 2006, harmless.

Sam, 2013 WL 5308865, at *7-8. The court then found the error was not harmless with respect to counts 23 and 24, which charged sexual penetration:

Counts 23 alleged a sexual penetration "[o]n or about and between January 10, 2007 to March 9, 2007." Count 24 alleged a sexual penetration "[o]n or about and between March 10, 2007 and April 30, 2007." The victim was 10 years old during these time frames. And this was during the time the family was in the second Casselman house. The victim told the interviewer that defendant would touch her "always with his hands. Like he would actually like mess—like put his fingers in my vagina and then rape me there. And then he would sometimes rape me in the butt. It was always switching off. And then sometimes he would want to like rape me from my vagina. It was just like always on and off, like different times." However, when the interviewer asked her how many times defendant had put his fingers in her vagina, she said, "I don't know, a couple times." The People argue the error was harmless.

However, because the evidence left open the possibility that defendant digitally penetrated the victim only twice (unlike every other day with counts 21 and 22) over a long time period (from July 1, 2005 during the time she lived at the second Casselman house to the time Danny and Ny moved out, which was January 2008), some of which predated the effective date of the statute, we cannot declare the instructional error was harmless beyond a reasonable doubt.

---

[6] These counts differ from counts 23 and 24 because the charges here were intercourse or sodomy. Counts 23 and 24 charged oral copulation or sexual penetration.

33

<u>Sam</u>, 2013 WL 5308865, at *8-9.

2      **B.  Legal Standards**

3      To obtain relief on federal habeas corpus review based on instructional error, a petitioner

4  must show that the error "'so infected the entire trial that the resulting conviction violates due

5  process.'"  <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991) (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141,

6  147 (1973)); <u>see also</u> <u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004); <u>Hendricks v. Vasquez</u>, 974

7  F.2d 1099, 1106 (9th Cir. 1992).  The standard for determining whether a petitioner is entitled to

8  relief is whether the error "had substantial and injurious effect or influence in determining the

9  jury's verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993); <u>Fry v. Pliler</u>, 551 U.S. 112,

10  121–22 (2007) (on federal habeas review, the <u>Brecht</u> standard applies whether or not the state

11  court has applied harmless error analysis under <u>Chapman v. California</u>, 386 U.S. 18 (1967)).

12      **C.  Analysis**

13      Petitioner challenges the state court's reliance on two facts: (1) that the victim and Chun

14  slept in the living room until January 2008, and (2) that the victim stated she was raped "every

15  other night" when they slept there.  With respect to the first fact, as discussed in the prior section,

16  the record contained adequate evidence to support the state court's finding that the victim and

17  Chun slept in the living room from the time they moved to 871 Casselman in July 2005 until their

18  brother Ny and Sophy Dong moved out in January 2008.  With respect to the second fact, the

19  victim's statement was that petitioner sodomized her "a lot."  (SCT 24 (LD 4).)  She described it

20  as "every other day or twice a week or just like – I don't know, like it wasn't a constant pace.  It

21  was just like whenever he felt like doing it."  (<u>Id.</u>)  Sophy Dong testified that the victim told her

22  petitioner molested her "almost all the time."  (RT 89.)

23      The jury saw the video recording of the victim's interview by the police investigator.  (RT

24  180.)  Jurors had the ability to examine the victim's credibility on the video when she described

25  the frequency of the rapes and abuse.  The record had sufficient evidence for a reasonable

26  factfinder to conclude that the victim was abused many times, even every other day, from the

27  time the family moved to 871 Casselman until the victim and Chun moved into a bedroom in

28  January 2008.  On this record, this court finds the state court's determination that the evidence

showed two acts of intercourse or sodomy after September 2006 was not unreasonable. Thus, there is no basis to conclude that the instructional error had substantial and injurious effect or influence in determining the jury's verdict. Accordingly, petitioner's final claim should be denied.

Accordingly, the court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed. See Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated: June 21, 2018

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DLB1/prisoner-habeas/sam0286.fr